JOHN METROPULOS, SR., Plaintiff-Appellee, v. CHICAGO ART GLASS, INC., *et al.*, Defendants-Appellants (John Metropulos, Jr., Defendant).

Second District No. 2—86—0550

Opinion filed June 10, 1987.

Lee Preston, of Chicago, for appellants.

Bruce W. Plattenberger, of Chicago, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Defendants, Chicago Art Glass, Inc. (Art Glass), Jeffery B. Fryer (Fryer), and Robert Prentice (Prentice), appeal from the judgment of the circuit court of Du Page County ordering the immediate return of 15,000 shares of Art Glass common stock to plaintiff, John Metropulos, Sr., after it determined that these shares were transferred by plaintiff to John Metropulos, Jr. (Metropulos, Jr.), a defendant who is not a party to this appeal, to be held in a constructive trust on behalf of plaintiff and that defendants were knowingly involved in the breach of a fiduciary duty by Metropulos, Jr., in the transfer, cancelling, and reissuance of this stock to Art Glass.

Defendants raise the following issues for review: (1) whether the

trial court erred as a matter of law in finding that a constructive trust was created when plaintiff transferred his 15,000 shares of common stock in Art Glass to his son, Metropulos, Jr.; (2) whether notice to Metropulos, Jr., of the restrictions placed on the transference of the 15,000 shares of common stock is attributable to Art Glass and its directors; (3) whether notice to Art Glass that plaintiff had "an interest" in or "some control" of the 15,000 shares of common stock is notice of an adverse claim; and (4) whether the findings of the trial court are against the manifest weight of the evidence.

On March 7, 1986, plaintiff filed a four-count complaint for injunctive and other relief against Art Glass and its board of directors, Metropulos, Jr., Fryer, and Prentice, requesting the circuit court: in count I, to void the actions of the board of directors of Art Glass on February 26, 1986, because the actions violated the corporation bylaws and State law, citing section 8.25 of the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 8.25); in count II, to impose a constructive trust over the 15,000 shares of stock on behalf of plaintiff as these shares were improperly transferred by Metropulos, Jr., to Art Glass with the knowledge of defendant Fryer and Prentice, who are shareholders and directors in Art Glass, and to order Art Glass to reissue the 15,000 shares of stock to plaintiff; in count III, to void the tender of the 15,000 shares of stock because the transfer lacked consideration; and in count IV, to award plaintiff damages for breach of his employment contract as he served as a corporate consultant for three years without receiving his $6,000-a-year salary. Hearings concerning plaintiff's petition for the issuance of the mandatory injunctive relief revealed the following information through testimony and exhibits.

Art Glass, a closely held corporation, was incorporated in 1978 and was in the business of producing stained glass. According to the stock record, 10,000 shares of common stock initially were issued to each of the three shareholders, Metropulos, Jr., Fryer, and Sekon Glassworks, Ltd. (Sekon), whose principal partner was Prentice. In July 1980, 15,000 shares of common stock were issued to plaintiff while Fryer transferred 2,500 shares of his stock to Metropulos, Jr. (1,250), and Sekon (1,250). In December 1985, the stock record reflected that Metropulos, Jr., acquired the 15,000 shares, and, in January 1986, the stock record reflects that the stock ownership was again 10,000 shares per original owner. Plaintiff was no longer listed as an owner.

Plaintiff testified that he has been a general agent in the insur-

ance business for 40 years and owns his own business. He became a shareholder and a director in Art Glass in July 1980 when he purchased 15,000 shares of common stock for $60,000. Plaintiff stated that he purchased these shares because Art Glass, partly owned by his son, Metropulos, Jr., was having financial trouble. He previously had been guaranteeing some banking loans for Art Glass. In 1980, however, with Art Glass needing a large capital investment, plaintiff, on the advice of his attorney, chose to purchase stock rather than lend the corporation money so in the event that Art Glass failed, plaintiff could "write off" his losses. Plaintiff became one-third owner of Art Glass while his son, Metropulos, Jr., and Prentice, through his control of Sekon, each owned 25% of the corporation with Fryer owning the remainder. Thereafter, plaintiff personally guaranteed three more loans for Art Glass following his purchase of his one-third ownership interest and became chairman of the board.

Plaintiff also stated that on May 23, 1985, he signed his 15,000 share stock certificate over to his son, Metropulos, Jr., because plaintiff was experiencing serious medical problems requiring open-heart surgery and wanted the stock in his son's possession if anything happened to him to avoid the stock going through probate. In addition, he wanted his son, who was the president of Art Glass and a member of its board of directors, to be able to freely vote the stock on plaintiff's behalf and give the corporation the ability to freely negotiate a Small Business Administration (SBA) loan on behalf of Art Glass. Plaintiff told his son, however, that under no condition was he to ever part with the 15,000 shares of stock, and if plaintiff recovered, he probably would want the stock back. He intended to leave the stock to Metropulos, Jr.'s children, as Art Glass was his son's business. Although he was still a director and chairman of the board of Art Glass, plaintiff was unaware that the corporation retired his stock in December 1985 and issued a new stock certificate for 15,000 shares in Metropulos, Jr.'s name, was unaware of the stock transfers in January 1986 or the adjusting ownership percentages in Art Glass, did not receive notice of the February 19, 1986, board of directors meeting, and did not attend either the February 19 or 26 meeting.

On February 25, 1986, plaintiff had a telephone conversation with his son, who informed him that Art Glass was reorganizing and returning to the one-third ownership format. Plaintiff objected to this reorganization and specifically objected to any reallocation of stock. His son informed him during this conversation that Fryer

would be bringing plaintiff various documents requiring plaintiff's signature. Plaintiff stated that Fryer came to his office with the updated minutes of past board meetings along with plaintiff's resignation as chairman of the board. He simply signed the minutes and then the resignation because he was so disgusted by the way the business was being handled. He was also informed by Fryer that there was going to be a board meeting the next day, although he did not know when he signed these documents that his stock was going to be turned back to Art Glass or that his 15,000 shares had been reissued in his son's name. Plaintiff's one-third liability on three loans which he guaranteed for Art Glass, two of which were guaranteed after the May 1985 transfer, remained.

Plaintiff admitted, however, that when he executed the transfer of the 15,000 shares to his son, he did not record in writing the conditions he stated were part of the transfer, that he never discussed these conditions with anyone other than his son and his wife, who did not testify, and that he did not request, nor did he have any reason to request, his son to return the stock immediately upon his recovery from surgery. He trusted his son, he trusted his son's friends and business partners, and he never involved an attorney in any of his dealings with his son. Plaintiff stated that during the February 25 telephone conversation with his son, plaintiff learned that the reorganization was necessary for Prentice to infuse an additional $100,000 of cash into Art Glass. Plaintiff also noted that he was not threatened or promised anything in return for the resignation and never received a $60,000 promissory note from his son.

John Metropulos, Jr., also testified to the original ownership of the corporation and plaintiff's $60,000 investment in 1980. He stated that plaintiff invested in the business because it was experiencing financial trouble. In May 1985, Metropulos, Jr., was in the process of negotiating an SBA loan and was informed that the application would probably be rejected because plaintiff was an owner in Art Glass and had a large net worth. He conveyed this information to his father. He was also aware of his father's health problems.

When plaintiff signed over the stock certificate to him, Metropulos, Jr., agreed to not convey or sell the stock and to hold onto it. At the time he accepted the 15,000 shares, Metropulos, Jr., was president of Art Glass. Thereafter, he turned over the old stock certificate to the corporation in December 1985 and was given a new certificate in his own name. He never informed plaintiff of this action or the other stock transfers which occurred in 1986. Metropulos, Jr., also stated that Fryer informed him in early December 1985

that Prentice was willing to put up funds to refinance Art Glass if he would sign back to the corporation the 15,000 shares. He did not inform plaintiff of either the stock transfer and reissuance or the February 19, 1986, board meeting because he felt plaintiff would disrupt the plans. The February 19 meeting did not proceed, however, as the proper paperwork was not presented and as there was no written resignation by plaintiff.

Metropulos, Jr., stated that he had a telephone conversation with plaintiff on February 25, 1986, at which time he informed plaintiff about the plan to sign the 15,000 shares of stock back to Art Glass so Prentice would invest the additional capital. He also told plaintiff that Fryer was coming by plaintiff's office with past corporate minutes for plaintiff to sign. Plaintiff informed him that he did not have the power to transfer the stock and that this transfer was against plaintiff's wishes. Metropulos, Jr., also stated that he received a $60,000 note payable on demand for the stock and that he did all these things because he was facing the prospect of bankruptcy and felt this was the only way out.

Metropulos, Jr., admitted that there was no written agreement evidencing the restrictions that plaintiff placed on the stock transfer, that he thought he could vote the shares, and that he knew he was not supposed to sell or convey the shares. He stated that he informed Fryer of the conditions plaintiff placed on the stock transfer, that he told Prentice that he was not to sell the shares of stock his father had given him, and that he told the corporate attorney of the conditions of transfer, although he never requested the attorney to put the restrictions in writing. Later, Metropulos, Jr., noted that he did not inform the attorney of these conditions until just prior to the February 26 meeting. He also admitted that while he told plaintiff on February 25 of his plan to turn the 15,000 shares over to the corporation, he did not tell plaintiff that he was receiving $60,000 from the corporation in return for the transfer. While testifying on his own behalf, Metropulos, Jr., reiterated both the conditions plaintiff had placed on the stock transference and the fact that he told his partners and his wife about these conditions. He stated that he simply disregarded his father's wishes and that he had informed his partners that he was selling stock back to the corporation against his father's wishes.

Fryer, when called as an adverse witness by plaintiff, testified that the corporation began with three equal partners, that he was aware of plaintiff's involvement in the corporation, and that plaintiff had been the guarantor of various loans for Art Glass. He stated

that he was told on a number of occasions that plaintiff had resigned from the corporation prior to the February 1986 meeting, and that Metropulos, Jr., told him that plaintiff was no longer a director. Based on this information, he did not bring a document identified below as petitioner's exhibit No. 8 to plaintiff for signature on February 25. Exhibit No. 8 is an unsigned resolution of the board of directors acknowledging the transference of plaintiff's 15,000 shares to Metropulos, Jr., the surrender of these shares to the corporation by Metropulos, Jr., in return for a $60,000 note, and the decision that all the stock would be called in and reissued with 10,000 shares to each of the original three owners. This language is identical to a document identified below as petitioner's exhibit No. 9, which is the resolution signed by the three remaining directors. Unlike petitioner's exhibit No. 8, there is no area for plaintiff to sign the resolution. Fryer also did not give a copy of the notice of the February 19 meeting to plaintiff. This notice included an agenda noting the proposed resolution to cancel plaintiff's stock.

Later, Fryer testified extensively in his own behalf that he is currently the president of Art Glass, a position he moved into following the February 26 meeting, that he was told by Metropulos, Jr., that plaintiff signed the stock over to Metropulos, Jr., because plaintiff's substantial assets and involvement in Art Glass would have jeopardized its ability to obtain an SBA loan, that he knowingly signed SBA loan applications in June and October 1985 which indicated that there were only three owners and which excluded any references to plaintiff. He also stated that he was directed by Metropulos, Jr., to remove petitioner's exhibit No. 8 from the documents he was taking to plaintiff for signature because plaintiff was no longer part of the corporation, that nothing occurred at the February 19 meeting because plaintiff was not present and had not submitted a written resignation, that he was told by Metropulos, Jr., that plaintiff had resigned, and that he brought the documents to plaintiff who read and signed the documents.

Fryer noted that when he brought the documents to plaintiff, he told plaintiff of the meeting the following day. He also told plaintiff that he and Prentice thought the corporation would be responsible to plaintiff for the $60,000 although Metropulos, Jr., insisted that he receive the money. Plaintiff, however, never mentioned to Fryer that he either restricted the transfer of the 15,000 shares to his son or transferred the shares in trust; Fryer never heard of any restrictions until this suit was filed; and when he brought the documents to plaintiff on February 25, 1986, plaintiff never claimed that the

15,000 shares were actually still his. Metropulos, Jr., told Fryer that the $60,000 was promised to plaintiff. In response to a question by the court, Fryer again stated that he did not bring petitioner's exhibit No. 8 to plaintiff because Metropulos, Jr., told him not to bring it. He also testified that he heard plaintiff state on many occasions that he "wanted out" of Art Glass.

Bessie Mitchell testified on behalf of defendants that she has been employed as the office manager at Art Glass for five years and has been involved in the operation of the office, that she prepared the notice of the February 19 directors meeting, that Metropulos, Jr., instructed her not to send plaintiff a notice of the meeting as plaintiff was no longer involved in the company and wanted nothing to do with it, and that Metropulos, Jr., told her that this was the reason why plaintiff turned the 15,000 shares of stock over to him. She also stated that she never heard of any restrictions being placed upon this transfer of the 15,000 shares of stock.

The trial court, noting that the two issues presented in this hearing for a mandatory injunction were whether plaintiff had an ownership interest in the 15,000 shares and whether the February 26 meeting was valid if plaintiff did not receive notice, initially found that plaintiff was not a director on February 26, 1986, because he had resigned the previous day, and, therefore, the meeting was valid. The court then found that plaintiff intended to retain an interest in and control of the 15,000 shares of stock although it was not clear what the terms of any trust may have been, that the plaintiff did not make a gratuitous transfer of the 15,000 shares, and that plaintiff's failure to immediately request the return of the 15,000 shares had no effect on the restricted transfer. It also found that the testimony demonstrated that plaintiff, while expressing a desire to remove himself from the day-to-day turmoil of a struggling company, did not wish to remove himself from the corporation entirely as indicated by plaintiff's guaranteeing of loans after his transfer of the 15,000 shares to his son, that Metropulos, Jr., held the 15,000 shares in a constructive trust on behalf of plaintiff, and that although it was difficult to find that the partners knew of plaintiff's continued involvement in Art Glass, they should have known of plaintiff's interest. The court specifically stated that it was apparent to Fryer that plaintiff still had an interest in Art Glass, that all parties knew that plaintiff was continuing to assert an interest in the stock, and that his shares should not have been liquidated.

Thereafter, the court entered a written order denying the relief requested in count I and granting the relief in count II. It did not

answer count III or rule on count IV. The court found no just reason for delaying enforcement or appeal of its order although it stayed the enforcement of its order pending the outcome of this appeal.

Defendants contend that the trial court erred as a matter of law in finding that a constructive trust was created by plaintiff's transfer of the 15,000 shares of stock because plaintiff failed to establish the existence of the constructive trust by clear and convincing evidence so strong, unequivocal and unmistakable as to lead to but one conclusion that a constructive trust was indeed created. In particular, they argue that the evidence is capable of reasonable explanation upon theories other than the existence of a trust, such as an outright gift of the shares to plaintiff's son, and is therefore not sufficient to support a declaration of a trust. In addition, defendants argue that the evidence is unequivocal and only establishes that plaintiff made an unrestricted transfer to his son, that no written document existed indicating that the transfer was restricted or in trust, and that plaintiff never told either Fryer or Prentice that the transfer was made with any restrictions or in trust. They urged that if plaintiff wished to transfer the 15,000 shares of stock as he testified, he could have put it in some type of writing. Finally, defendants argue that plaintiff failed to prove either fraud or abuse of a confidential relationship in the transfer of the 15,000 shares of stock thereby preventing a constructive trust from being applicable as a matter of law.

Plaintiff responds that the record demonstrates that the trial court's decision is not against the manifest weight of the evidence and that the trial court's findings of fact are supported by the testimony and evidence presented at the hearings. In particular, he notes that although a constructive trust must be demonstrated by clear and convincing evidence, this determination remains a question of fact and the trial court's decision is given great weight as it is in a superior position to determine the credibility of the testimony. Plaintiff highlights the fact that the court specifically found that the transfer was not a gift and that plaintiff's testimony was credible and that the testimony and evidence supports plaintiff's claims of a restricted transfer. Additionally, he points to direct testimony that Art Glass, through all of its officers and directors, knew that Metropulos, Jr., had no authority to turn in the 15,000 shares of stock, and that even if this court finds it necessary to have a confidential or fiduciary relationship prior to finding a constructive trust, a fiduciary relationship did exist between plaintiff and Metropulos, Jr., as

Metropulos, Jr., was plaintiff's agent in handling the stock and as Metropulos, Jr., was in a superior position over plaintiff because of his deteriorating health and age and because of his enormous amount of trust and confidence in his son.

Defendants reply that the evidence in this case clearly gives a reasonable alternative theory to the creation of a constructive trust and, as such, is insufficient to support the trial court's conclusions. Defendants' argument centers on the fact that there were no written conditions presented below; however, they do not cite any authority which holds that parol evidence of these conditions is unacceptable.

■■■ A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct. (*Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 293, 499 N.E.2d 1319.) Where property has been acquired wrongfully, the party in possession may be declared to be a constructive trustee of the property if it would be unjust for that party to retain it. (114 Ill. 2d 278, 293, 499 N.E.2d 1319; *People ex rel. Hartigan v. Candy Club* (1986), 149 Ill. App. 3d 498, 502, 501 N.E.2d 188.) The constructive trust arises by operation of law, and the constructive trustee's sole duty is to transfer title and possession to the beneficiary. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 293, 499 N.E.2d 1319; *Taino v. Sanchez* (1986), 147 Ill. App. 3d 871, 873-74, 498 N.E.2d 571. See also G. C. Bogert & G. T. Bogert, Trusts sec. 77, at 287-90 (5th ed. 1973).

■ Constructive trusts are generally divided into two groups: (1) those created where actual fraud exists; and (2) those arising by virtue of the existence of a fiduciary or confidential relationship. (*Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 293, 499 N.E.2d 1319; *Perry v. Wyeth* (1962), 25 Ill. 2d 250, 253, 184 N.E.2d 861; *Taino v. Sanchez* (1986), 147 Ill. App. 3d 871, 874, 498 N.E.2d 571.) An examination of the record indicates that there are no allegations of fraud, and the evidence presented below did not raise this issue. Therefore, whether a constructive trust was properly imposed on the 15,000 shares of stock will depend upon whether a fiduciary or confidential relationship existed between plaintiff and his son, Metropulos, Jr., and whether this relationship was abused.

■■■ Whether or not a fiduciary relationship exists between the parties depends upon the facts in each case (*Taino v. Sanchez* (1986), 147 Ill. App. 3d 871, 874, 498 N.E.2d 571), and where a con-

fidential relationship does not exist as a matter of law, it must be proved by clear and convincing evidence. (See *Stein v. Stein* (1947), 398 Ill. 397, 403, 75 N.E.2d 869; *A. T. Kearney, Inc. v. INCA International* (1985), 132 Ill. App. 3d 655, 661, 477 N.E.2d 1326.) Proof of a confidential relationship requires a showing that one party has reposed trust and confidence in another who thereby gains influence and superiority over the other. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 304, 367 N.E.2d 678; *Kester v. Crilly* (1950), 405 Ill. 425, 432, 91 N.E.2d 419; *Taino v. Sanchez* (1986), 147 Ill. App. 3d 871, 874, 498 N.E.2d 571.) Factors to be considered in determining whether a confidential relationship exist are the degree of kinship of the parties, the disparity in age, health, and mental condition, education and business experience between them, and the degree of trust placed in the dominant party. (*Kester v. Crilly* (1950), 405 Ill. 425, 432, 91 N.E.2d 419; *Taino v. Sanchez* (1986), 147 Ill. App. 3d 871, 874, 498 N.E.2d 571.) The findings of the trial court, however, will not be disturbed unless they are against the manifest weight of the evidence. (*People ex rel. Daley v. Warren Motors, Inc.* (1986), 114 Ill. 2d 305, 320, 500 N.E.2d 22.) Additionally, where a confidential relation is found to exist, there is a presumption that the transaction complained of resulted from undue influence (*Kester v. Crilly* (1950), 405 Ill. 425, 432, 91 N.E.2d 419), thereby shifting the burden to the other parties to establish the fairness of the transaction. See *Nordlund v. Nordlund* (1983), 116 Ill. App. 3d 223, 226, 452 N.E.2d 18; *Edwards v. Miller* (1978), 61 Ill. App. 3d 1023, 1028, 378 N.E.2d 583.

■ ■ From our review of the record, it appears that the evidence presented supports the trial court's finding by clear and convincing evidence. The trial court found that based upon the testimony, Metropulos, Jr., held the 15,000 shares of stock in trust for plaintiff. Plaintiff testified that, while transferring the shares to his son without any written conditions, he placed certain oral restrictions upon the use of the shares. Metropulos, Jr., supported this testimony. The trial court specifically found that plaintiff intended to retain an interest in the stock. The evidence demonstrated that the transfer was made because of the faith and trust plaintiff had in his son. While the mere fact of a blood relationship, such as a parent and child, does not establish a fiduciary relationship (see *Perry v. Wyeth* (1962), 25 Ill. 2d 250, 253, 184 N.E.2d 861), the testimony demonstrates that plaintiff entrusted his son with the 15,000 shares of stock to avoid any problem which may arise with plaintiff's surgery and to avoid any undue problems with obtaining an SBA loan.

The testimony also indicates that plaintiff intended his son to utilize the shares on plaintiff's behalf for the benefit of Art Glass, as plaintiff not only had a sizeable liability in the company, but continued to guarantee loans for the company in which he thought he owned a sizeable interest. Defendants do not dispute that the testimony of both plaintiff and Metropulos, Jr., is that the stock transfer in May 1985 was restricted and that Metropulos, Jr., was president of Art Glass when he accepted the transfer. Defendants also agreed at oral argument that if Metropulos, Jr.'s knowledge of the restrictions is imputed to the corporation, then Art Glass knew there was a restricted transfer and the corporation ought not to have redeemed the 15,000 shares of stock. While plaintiff's testimony is self-serving and defendants present a variety of alternative theories as to plaintiff's intentions, the existence of this confidential relationship is a question of fact, and the trial court, which observed the demeanor of the witnesses, is best able to judge their credibility and determine how much weight to give their testimony. See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 315, 469 N.E.2d 183.

Although defendants dispute the existence of a fiduciary or confidential relationship, the trial court found plaintiff's testimony credible. Metropulos, Jr.'s testimony does not dispute the trust and faith placed in him by his father, and Fryer's testimony does not contradict the existence of this fiduciary relationship. This, taken with the reasons given by plaintiff for the transfer and the large investment plaintiff has made in his son's business, indicates the necessary showing of trust and confidence placed by plaintiff in Metropulos, Jr., to establish the confidential relationship. Accordingly, there is sufficient evidence to support the imposition of a constructive trust.

The record indicates that Metropulos, Jr., transferred the 15,000 shares back to Art Glass without plaintiff's knowledge or authority and received $60,000 compensation which was not given to plaintiff. He stated that he transferred the shares without his father's permission. It is undisputed that plaintiff's son breached their relationship by taking unfair advantage of his superior position of possession of the 15,000 shares of stock to act for himself. Defendants do not claim that Metropulos, Jr., transferred the 15,000 shares with plaintiff's knowledge or permission. As the findings of the trial court are supported by the record, we find that the evidence demonstrates that Metropulos, Jr., took unfair advantage of his position, and the trial court's decision to impose a constructive trust over the 15,000 shares of stock is not against the manifest weight of the evidence.

■ This determination, however, does not allow the trial court to impose the constructive trust on the 15,000 shares of stock and order the 15,000 shares of stock reissued to plaintiff unless the corporation, or its directors or officers, assisted in the breach of Metropulos, Jr.'s duty to plaintiff. A constructive trust may be imposed upon property obtained by a third person through his knowledge of or involvement in a fiduciary's breach of duty. See *People ex rel. Daley v. Warren Motors, Inc.* (1986), 114 Ill. 2d 305, 316, 500 N.E.2d 22; see also *A. T. Kearney, Inc. v. INCA International* (1985), 132 Ill. App. 3d 655, 661, 477 N.E.2d 1326; *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 454-55, 411 N.E.2d 1067.

■ Defendants contend that notice or knowledge of the restrictions placed on the transfer of the 15,000 shares of stock by plaintiff cannot be attributable to the corporation simply because Metropulos, Jr., was the president and director of Art Glass as Metropulos, Jr., was acting on his own behalf, and his knowledge cannot, therefore, be imputed to the corporation. Relying on the findings of the trial court, they argue the court below was not convinced as to whether or not the corporation knew of the restrictions. Plaintiff responds that the trial court found that defendants had actual notice of plaintiff's ownership interest in the 15,000 shares of stock. In addition, plaintiff argues that plaintiff transferred the 15,000 shares of stock to his son as president of Art Glass to avoid causing any problems with obtaining an SBA loan, thereby giving notice to the corporation of the restrictions.

The facts indicate that, although acting on his own behalf when he transferred the shares to the corporation in December 1985 and later received $60,000, Metropulos, Jr., originally accepted in May 1985 the transfer of the 15,000 shares of stock from his father in his capacity as president of Art Glass not only to avoid future management problems if plaintiff died, but also to avoid problems with obtaining SBA loans. Defendants do not dispute that if an officer of a corporation has knowledge or notice of facts, that knowledge or notice is imputed to the corporation. (See *A. T. Kearney, Inc. v. INCA International* (1985), 132 Ill. App. 3d 655, 662, 477 N.E.2d 1326.) Although defendants avoid recognizing the effect of the events prior to the surrender of stock in December 1985, this knowledge of the restrictions is what was initially imputed to the corporation and defendants. Thereafter, defendants knew that the transfer was against plaintiff's wishes because of this imputed knowledge. This was sufficient to establish a constructive trust in the stock against defendants.

 Although defendants may not have induced the breach by Metropulos, Jr., or may not have directly participated in the breach, there appears to be no doubt that they knowingly accepted the benefit of the breach, that being obtaining control over Art Glass, thereby becoming directly liable under a theory of constructive trust. (See *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 455, 411 N.E.2d 1067.) The trial court also specifically found that all parties knew of plaintiff's continued interest in the 15,000 shares of stock. The trial court then found that plaintiff's continuing role as a guarantor of financial obligations, the reason for plaintiff initially receiving the stock, after the May 1985 transfer of the 15,000 share stock certificate to his son demonstrated an additional basis to support the corporation's knowledge of plaintiff's continued interest in the 15,000 shares of stock. The court found that this continuing role, along with the activities which occurred in February 1986, made it apparent to Fryer that plaintiff had a continuing interest both in the activities of the corporation and the 15,000 shares of stock, thereby making it improper for the corporation to have liquidated the 15,000 shares of stock at the February 26 meeting.

Defendants, however, contend that the evidence was insufficient to prove actual notice of an improper transfer, and at the very least, demonstrated that Metropulos, Jr., had apparent authority to convey the 15,000 shares back to Art Glass, which then became a *bona fide* purchaser of the stock as it did not receive adequate notice of an adverse claim as required by section 8—304 of the Uniform Commercial Code-Investment Securities (Ill. Rev. Stat. 1985, ch. 26, par. 8—304). Defendants argue that they were under no duty to inquire further into the nature of Metropulos, Jr.'s authority over the 15,000 shares of stock, and that "an interest" or "some control" over the 15,000 shares of stock was not sufficient to inform the corporation and its remaining officers and directors that the transfer was improper under section 8—403. (Ill. Rev. Stat. 1985, ch. 26, par. 8—403.) In addition, they argue that plaintiff's failure to affirmatively notify defendants of the impropriety of the transfer prevented them from having the necessary knowledge for improper conduct and that retaining some control of the stock is not retaining an interest which would defeat the sale or redemption of that stock. It has been determined previously, however, that the corporation, being the purchaser of the 15,000 shares of stock, had more than mere knowledge of some control of the stock; it had knowledge of what that control was: that plaintiff had a continued interest in the stock and that Metropulos, Jr.'s sale of the stock was a breach of his duty

to plaintiff not to transfer the stock. The corporation would thereby be charged with notice of the claim under section 8—304(2) (Ill. Rev. Stat. 1985, ch. 26, par. 8—304(2)). As there is more than mere knowledge of retention of some control by plaintiff, defendants' reliance on section 8—304 and section 8—403 is inapposite.

Although defendants' final contention is that the decision of the trial court is against the manifest weight of the evidence, this had been decided previously, and it is unnecessary to again review this issue. The trial court, as the best judge of the witnesses' credibility and of the weight to be afforded the testimony (see *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 315, 469 N.E.2d 183), found that there was sufficient evidence presented to support the imposition of a constructive trust over the 15,000 shares, and this court will not substitute its judgment for that of the trial court when the decision is not against the manifest weight of the evidence.

Defendants also raise a new issue for the first time on appeal. Labelling it as a crucial issue, they argue that Metropulos, Jr., only transferred 9,000 shares of stock of his total of 25,000 shares of stock improperly as it could not have been assumed that the 15,000 shares of stock, already commingled with Metropulos, Jr.'s other 10,000 shares of stock, which were transferred back to the corporation, were all plaintiff's 15,000 shares of stock. As this issue was never presented to the trial court, it is deemed waived. *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872.

For the foregoing reasons, we find that the judgment of the circuit court of Du Page County ordering the immediate return of 15,000 shares of Art Glass common stock to plaintiff after determining that these shares were transferred by plaintiff to his son in a constructive trust on behalf of plaintiff and that defendants were knowingly involved in the breach of a fiduciary duty by the son in the transfer and cancelling of this stock to Art Glass is not against the manifest weight of the evidence.

Affirmed.

LINDBERG, P.J., and UNVERZAGT, J., concur.